**FARMERS' LOAN & TRUST CO. et al. v. TOLEDO, A. A. & N. M. RY. CO. et al.**

(Circuit Court, N. D. Ohio, W. D. March 14, 1895.)

No. 1,182.

1. MASTER AND SERVANT—NEGLIGENCE—DERAILMENT OF RAILROAD TRAIN.
    Where a railroad train was derailed and thrown down an embankment into a marsh in such position that the contents of the tender were thrown into the cab of the overturned engine, and no sound was thereafter heard from the fireman and engineer, *held*, both as matter of fact and matter of law, that the derailing of the train was the cause of their death, and that although an oil car was coupled next to the tender, which after the accident discharged oil into the cab, causing it to take fire and burn up, yet the placing of such oil tank in that position in the train by the coservants of the engineer and fireman could not be considered as a contributing proximate cause, which would bar a recovery.

2. SAME—PRESUMPTION FROM OCCURRENCE OF ACCIDENT.
    The fact of the derailment of a train or a sliding and giving way of the entire roadbed, over a newly-constructed embankment, makes a prima facie case of negligence, which it is the duty of the defendant to overcome by testimony showing that all proper precautions were taken in preparing for and carrying on the work of constructing the embankment, and in running trains over it.

**8. DAMAGES FOR WRONGFUL DEATH—AMOUNT—STATE STATUTES.**

The fact that the legislatures of a large number of states have limited the amount of recovery in cases of death by wrongful act to $10,000 *held* to be a legislative construction of a fair maximum award, which should not be exceeded by a federal court upon interventions against a receiver operating a road under direction of the court.

These were intervening petitions filed by Cassie Alberts, administratrix of George Alberts, deceased, and by Ida B. Beaulieu, administratrix of Silvio H. Beaulieu, deceased, in the suit brought by the Farmers' Loan & Trust Company against the Toledo, Ann Arbor & North Michigan Railway Company and others, to recover damages for alleged negligence of the receiver and his agents and employés, resulting in the death of the petitioners' intestates, respectively. On the 6th and 25th days of April, 1894, respectively, orders were made referring the matters set forth in the petitions to L. S. Trowbridge, special master, to ascertain and compute the damages of the petitioners. By stipulation, the testimony in each case was made admissible in the other, as the death of both intestates was caused at the same time and by the same accident. The special master having filed his report, the case is now heard upon exceptions to the same. The material parts of the report are set forth below:

On the 25th of October, 1893, George Alberts, the husband of the petitioner Cassie Alberts, of whose estate she is administratrix, and Silvio H. Beaulieu, the husband of the petitioner Ida B. Beaulieu, and of whose estate she is administratrix, were killed, while in the employment of Wellington R. Burt, the receiver of the defendant railway company. As the whole case centers about their death, a brief statement leading up to this catastrophe will be necessary. The railway, which the receiver was at that time, and still is, operating, between the stations of Hamburg Junction and Pettysville, passed over two tamarack swamps, known as the north and south marshes. There was considerable testimony relating to the north marsh, but it may all be disregarded, as the events connected with this case are confined to the south marsh. The roadbed across this marsh was originally built 9 or 10 years ago, and was from 1½ to 2 feet high. There was no evidence that there had ever been any unusual sinking of the roadbed. To improve the track and do away with a steep grade on the north side of the marsh, the receiver, through his general manager, Mr. Ashley, determined to raise the roadbed or embankment across this marsh to a height of 8 or 9 feet. Work was commenced on the 2d of October, and continued until the 25th of October. It is not clear whether the embankment was considered as finished at that time or not. Mr. Riggs, the chief engineer, said it still lacked two or three inches of being up to the required grade. Mr. Stein, the master of construction, seemed to think it was completed, and spoke of the work train taking the men to Howell as if they had finished that job, but, as the men boarded at Howell, that circumstance may have been nothing more than the usual going home at night. It is not very important whether it was considered finished or not. A train load of earth was dumped on the embankment at the place where the accident afterwards occurred, between 4 and 5 o'clock in the afternoon of October 25th. The work train passed over the track twice after that. About a quarter past five o'clock a passenger train passed over it. Between 6 and 7 o'clock a freight train of 27 cars, drawn by a heavy locomotive, left Hamburg Junction, bound north. When about one-half or two-thirds of the way across the marsh, the track and the embankment under the locomotive slid off to the east. The locomotive and tender and seven cars were derailed, the locomotive thrown over on its side near the foot of the embankment, the cab being thrust two or three feet into the soft muck of the marsh, beyond

the foot of the embankment. A flat car carrying an oil tank was next to the tender. The tender was doubled around and lying next to the engine, its rear being towards the front of the engine. The oil tank was lying, one end on the tender, and the other upon the bank. The oil ran out through a crack in the tank, down the bank onto the tender, and into the cab; took fire, and burned up. George Alberts, who was the fireman on the locomotive, and Silvio H. Beaulieu, who was the engineer on the locomotive, were never after seen, and no portion of their remains that could be identified was found. The right of the complainants to recover in this case and the liability of the defendant must depend upon where the responsibility for the accident shall be found to rest.

On behalf of the complainants, it is claimed that the accident was due to the faulty construction of the embankment across the marsh, and the want of such care and attention as, under the circumstances, ordinary prudence required; that the embankment sloughed off or slid away on the east side, causing the engine to fall over on its side. On behalf of the defendant, it is claimed that the accident was due to the sinking or giving way of the foundation under the embankment; that that was a latent defect, not discoverable by ordinary means; and that the defendant, having exercised all the care and taken all the precautions which a reasonable prudence would require in constructing the embankment, is not liable.

Before proceeding to the consideration of the main questions involved, I desire to dispose of two minor matters.

It was urged with much persistence by one of the counsel, on behalf of the defendant, that the complainants, having alleged in their petition that "the grade of said road * * * settled, the ground and earth thereunder giving way, and slid out on the east side, and toppled over," etc., could not base their claims upon any other theory than that of the sinking or giving way of the foundation underneath the embankment; that is, the soft muck of the marsh. I cannot agree with the counsel's construction of the phraseology of the allegation in the petition, or the conclusions which he drew from it, but do not think it necessary to discuss the subject.

In the amended answer of defendant, it was alleged that the complainants could not recover by reason of the contributory negligence of a fellow servant of their decedents, in making up the train, and placing an oil car next to the locomotive, in violation of an established order of the defendant. I have not been furnished with a copy of the amended answer, but such is my recollection of the allegation. No evidence was offered to show any such order. It was not contended that the placing of the oil car next to the engine contributed in any way to the derailment of the train, but that it may possibly have contributed to the death of the engineer and fireman. The most that could be claimed for it would be that it may have aggravated the injury. But that, as a question of fact, is purely speculative, and not supported by any evidence. If the men were dead when the fire broke out, then the placing of the oil car next to the engine was of no consequence. It did not contribute to their death. There is not much positive evidence on the subject, and the conclusion must be rather from inference than from positive proof. Some time elapsed between the derailment of the train and the breaking out of the fire. Not much, it is true, but some time; perhaps two minutes, more or less. No outcry was heard, and they had not been able to extricate themselves from the muck. When the conductor Fludder reached the engine, standing where he could put his hand on it, he could hear no sound of human voice. Brakeman Good, on the other side of the fire, shouted to his brother brakeman, but received no response. The engine had been thrown over, and the cab thrust two or three feet into the soft muck of the marsh. The contents of the tender, doubtless several tons in weight of coal, had been overturned into the engine and cab. The door of the fire box was opened, and its contents had been emptied into the cab. Such portions of the remains of the engineer and fireman as were afterwards found were taken from the hole made by the cab in the muck, at the foot of the embankment. I think, therefore, that the preponderance of the evidence indicates that the death of the engineer and fireman was caused by the derailment and overturning of the engine.

and not by the fire which afterwards ensued; and so I find as a matter of fact. If, however, I should be mistaken as to that fact, there would still be left the question whether the negligence complained of would be a bar to the complainants' right to recover. It is hardly within the scope of this report to enter upon a thorough discussion of the subject of contributory negligence. I think it may be safely stated that the following principles are well established by authority: ·

As stated by Judge Cooley (Cooley, Torts, p. 816): "The negligence that will defeat a recovery must be such as proximately contributes to the injury. The remote cause will no more be noticed as a ground of defense than as a ground of recovery." In other words, the negligence of a fellow servant of the plaintiffs, to be a bar to recovery, must have been the proximate cause of the injury, or, at least, must have contributed to the proximate cause. It was said by Coleridge, J., that "that negligence upon the part of the plaintiff which is to bar his recovery should have substantially contributed to the occurrence of the injury, and not merely to its amount." Sills v. Brown, 9 Car. & P. 601; Patt. Ry. Acc. Law, § 48; Wasmer v. Railroad Co., 80 N. Y. 212. Where the plaintiff's negligence ·contributed merely to aggravate the injury, without contributing to the happening of the accident, it will be no bar. Stebbins v. Railway Co., 54 Vt. 464; Gould v. McKenna, 86 Pa. St. 297; Shearm. & R. Neg. § 95; Lane v. Atlantic Works, 107 Mass. 104.

What was the proximate cause of the injury in this case? Manifestly, the derailment of the train. "Proximate cause is the efficient cause that necessarily set the other causes in operation. The causes that are merely incidental, or instruments of a superior or controlling agency, are not the proximate and responsible causes, though they may be near in point of time. The proximate cause, therefore, must be that which preceded and directly brought on and set in motion the intermediate series of incidents which ended in the casualty." Pennsylvania Co. v. Congdon, 134 Ind. 226, 33 N. E. 795; Whart. Neg. § 341. "No wrongdoer ought to be allowed to apportion or qualify his own wrong; and that, as a loss has actually happened whilst his own wrongful act was in force and operation, he ought not to be permitted to set up as a defense that there was a more immediate cause of the loss, if that cause was put in operation by his own wrongful act. To entitle such party to exemption, he must ·show, not only that the same loss might have happened, but must have happened if the act complained of had not been done." Davis v. Garrett, 6 Bing. 716; Beauchamp v. Mining Co., 50 Mich. 163, 15 N. W. 65; cited in Cooley, Torts, in note, p. 78. "My remote negligence will not protect a person who, by proximate negligence, does me an injury." Whart. Neg. § 324.

I think it will not be seriously argued that the position of the oil car in the train, or its proximity to the locomotive, contributed in the slightest degree to the derailment of the engine. As was well said on the hearing, if the oil car had been the last car in the train, or had been left out entirely at Toledo, the roadbed and embankment would have slid away as it did, and the engine have been derailed as it was. I find therefore, as a fact, that the placing of the oil car next to the engine, if negligence on the part of a fellow servant, was not, in the eye of the law, contributory to the accident, and constitutes no defense in this case.

I am brought now to the consideration of the more serious and important question: What caused the accident by which the complainants' decedents lost their lives? Was the accident due to the sinking of the earth or foundation under the embankment, and had the defendant used all the care which ordinary prudence in such a case would require, or was it due to the giving way of the embankment itself, and had the defendant used such care and precaution in its construction as would acquit him of all blame? An intelligent consideration of these questions renders necessary some references to the evidence, which I will endeavor to make as brief as the importance of the case will allow.

It was stated by all the experts who testified on the subject—and I presume will be conceded—that the first duty of the defendant before raising the embankment was to ascertain, by proper soundings, the condition of the marsh, and the depth of the muck or soft earth on the line where the old embankment

was built. The defendant recognized that duty, and offered evidence tending to prove the taking of such soundings. On this point there are remarkable discrepancies in the statements of witnesses for the defendant. Mr. Ashley, the general manager for the defendant, testifies that he went to the locality on the 2d of October, 1893, in his private car, for the purpose of making soundings across the marsh or swamp; that he left his car on the siding at the ice-house at Hamburg Junction; that he commenced his soundings about 250 feet from the south side of the marsh; that he went north, making soundings at intervals of 18 to 20 feet, until halfway across the swamp, afterwards at longer intervals; that he made 10 or 12, or perhaps 15, soundings in all,—not more than 15; that they extended across the marsh, which he estimated to be about 700 or 800 feet in width; that he made soundings at about the place where the accident afterwards occurred, and found the depth to be about 8 feet; that the depth of the soundings ranged from 4 to 14 feet; that he made no record of them, and did not direct Mr. Stein, then superintendent of track, to make any record; that he did not see Mr. Stein make any record, though Mr. Stein afterwards told him that he had done so; that the rod was easily removed after being forced to the bottom; that he removed it alone; that the work was begun the following day, and was in continued progress up to the time of the accident, and up to the present time. "The work is just now completed." Mr. Riggs, a civil engineer for the receiver, testifies that Mr. Ashley and Mr. Stein made soundings several weeks prior to the commencement of the work; that they were reported to him by Mr. Stein the day they were taken, but not in writing; did not see any written record of soundings; that the work was begun a week or so after he had made his plans for doing the work. Witness presented a blue print (Exhibit ——), showing the profile of the old grade and the new grade line, the width and slope of the embankment, etc., and stated that the scale was 5 feet to the inch; that the distance from the north end of the marsh to the lower end of the map was 800 feet; but that the marsh extended 1,400 feet beyond. He thought there was an error of judgment in sounding. Mr. Stein, at that time superintendent of track, testified: That on the 2d of October he met Mr. Ashley by appointment, and assisted in making the soundings, and in some cases in taking the rod out. Mr. Ashley left his car on the Bennett siding. That he entered the soundings in his book, just as quick as the rod was pulled out and cleaned off, and he had washed his hands. No sounding was complete until he had it down in his book. That he did not give engineer any soundings or figures of soundings. Never reported soundings to anybody, and never took record of any other soundings. These soundings commenced 300 feet north of where the wreck afterwards occurred, and went south, and his record continued to a point 600 feet from where he commenced. There were further soundings, but he made no record of them. The page of the book upon which the record of the soundings was made is remarkably clean for one used in that way, and the figures and handwriting are remarkably good, being made under such circumstances.

I cannot resist the conviction that this record was entirely an afterthought, and was not made at the time, but afterwards, from recollection or information of others. The witness, in making it, commenced at the opposite end of the marsh from where Mr. Ashley commenced. If this record was made at the time, as testified to, it is incredible that Mr. Ashley should not have known it. Other witnesses assert most positively that there was no siding at Bennett's; that it had been taken up some time before. It is not worth while to consider in detail the many and various contradictions in the statements of these witnesses. It is impossible to reconcile them. They cannot all be true. Some one of the three must have been mistaken, but which one? If the marsh was 2,200 feet across, as Riggs testifies, and he measured 800 feet of it, and Ashley made the number of soundings that he testified to, then either he could not have covered the whole extent of the marsh, or his soundings were at much longer intervals then he supposed. If, in the exercise of ordinary care and precaution, it was necessary to make soundings at all, of which there seems to be no doubt, then it was equally necessary that they be made thoroughly and carefully. Upon that subject these numerous contradictions by defendant's witnesses would seem to cast a reasonable doubt, especially in view of the fact that in one sounding, made by Prof. Green, a disinterested witness, at the place

where the accident occurred, the sounding rod was put down 30 feet without reaching solid bottom. If the case depended on that fact, I should be obliged to find that the defendant has not shown by a clear preponderance of evidence such care and precaution as ordinary prudence, under the circumstances, required. But, in the view that I take of the case, the soundings are not of great importance.

### The Sinking of the Foundation.

To establish the theory that the accident was caused by the sinking of the foundation under the embankment, the defendant sought to show that on two occasions, one on the 26th or 27th of October, 1893, and the other in the spring of 1894, in digging down at the place of the accident, they found the old roadbed three or four feet below the level of the marsh. Mr. Stein testified that on the 26th or 27th of October, in digging down to get a solid foundation for the jacks, to raise the engine, he found the old roadbed. It does not appear very distinctly just where that excavation was made, but it must have been made near the foot of the embankment; otherwise it could not have reached the marsh at all. A couple of weeks before his examination, he made another excavation, for the purpose of finding the old roadbed, and he found it three or four feet below the level of the marsh. "It went down level, and a little over four feet." The place of this excavation was fixed with great particularity. It was on the side of the slope at the bottom. It was about 13 feet from the fence, and he points out on Exhibit E the place. He knew the old roadbed, could tell it when he saw it. It is not too strong to characterize this testimony as reckless. He had already testified that the old roadbed extended beyond the ties 1½ feet on each side, and that the new roadbed was 38 or 40 feet wide at the bottom. It follows, then, as a mathematical certainty, that the place where this excavation was made was at least 9 or 10 feet beyond the extreme edge of the old roadbed. To find the old roadbed there was a physical impossibility. It could not have been there, as he testified, unless, by some inconceivable freak of nature, it had slipped out from under the mass of new material that had been placed on it, and slid away, horizontally on a level, a distance of 9 or 10 feet.

It would seem reasonable that, if there had been a giving way of the foundation, the whole roadbed would have sunk uniformly, but it did not. Had it done so, the engine would not have tipped over. By a great preponderance of evidence, the west side stood up, and was nearly as high after the accident as before. The top may have been disturbed by the sliding away of the track, but evidently there was no sinking. To confirm defendant's theory, it was sought to show that there was a sinking about 90 feet north of where the engine went down. Mr. Stein testified that the morning after the wreck, about 11 o'clock, he found the roadbed was down 4 or 5 feet. The ties were hanging to the rails, so a man could crawl under the ties. He is confirmed somewhat by witness Kettel, but contradicted by witness Russell, who had charge of the work train, and who testified that the place was not in the shape as described by Stein; that the dirt and rails all settled together; that he ran his train on it, and it settled about three feet; that he lifted the track probably 22 times that day, and it went down probably 10 or 15 feet; that there was a heaving of the marsh after they got almost to the bottom. That was undoubtedly a genuine sink, but the whole embankment sank, and the train that was on it was not derailed or overturned. Two witnesses, Sweet and Duff, testified that they were present when the tamarack logs were put in; that they were down in where the men were at work, and the logs were laid on the old roadbed. One of them was sure that he stood on it. There are other considerations which would seem to settle conclusively that there was no sinking of the foundation. There was no upheaval of the marsh, as would probably, if not necessarily, have been the case had the sink occurred. Again, if the foundation did sink, why did it stop at the depth of 4 feet? The soundings, testified to by Ashley and Stein, showed a depth of the soft muck of the marsh, at the place of the accident, of from 8 to 12 feet. In the sink, 90 feet north of the accident, the embankment continued to sink until they had raised the track 22 times in one day, or 10 or 15 feet altogether. Now, if there was a sink at the place of the accident, why did it not sink uniformly,

and continue to sink until it reached solid bottom, 8 or 10 feet below? I conclude, therefore, as a question of fact, that the derailment of the engine was not caused by the sinking or giving way of the foundation under the embankment.

## The Giving Way of the Embankment.

Was the accident caused by the sloughing off or the giving way of the embankment itself, and had the defendant used such care and precaution in its construction as would acquit him of all blame? An affirmative answer to the first part of this question necessarily follows the finding that the accident was not caused by the sinking of the foundation. The more serious question is, did the defendant use such care as, under the circumstances, reasonable prudence required? A presumption of negligence often arises from the accident itself. It has been held to furnish proof of negligence in the derailment of trains, and in the giving way of railroad embankments. Curtis v. Railroad Co., 18 N. Y. 534; Edgerton v. Railroad Co., 39 N. Y. 227; Railroad Co. v. Anderson, 94 Pa. St. 351. The presumption would not seem to be a violent one in this case. A railroad embankment in process of construction (for it could not be considered as completed), upon which earth had been deposited, and the track raised but a few hours before the accident, gives way, resulting in the overturning of the engine, and the death of the engineer, fireman, and brakeman. It is a matter of common knowledge that such embankments, when constructed with proper care, do not give way, so that the presumption of negligence does not seem to be unreasonable. To rebut this presumption, the defendant sought to show the condition of the embankment on the 25th of October, in addition to some other evidence, by measurements taken six months afterwards, and by showing that the embankment, when so measured, had not been enlarged after it had been restored. Such proof, to be satisfactory, should be very clear, definite, and distinct. These measurements show an embankment of reasonable proportions, except in one place, where the sink had been, where the embankment was only 10½ feet wide on the top,—5½ feet narrower than the standard roadbed. I do not think, however, that it appears by a preponderance of evidence that the embankment of April, 1894, was practically or substantially the same as that of October 25, 1893. The evidence is conflicting as to how much work was done on the embankment after the accident. Two of defendants' witnesses, Kettel and Russell, say the work was finished in five or six days, and nothing was done after that. Mr. Stein said they hauled in 78 car loads of material in one day, and nothing was done after that. Mr. Ashley said the work commenced the day after the soundings were made, and "was in continued progress up to the time of the accident, and up to the present time. The work is just now completed." He afterwards qualified that by saying that "just at the point of the wreck the track was brought up to grade in five or six days, but between that point and Pettysville station, work was continued until it froze up in the fall, and that was finished this spring." On the other hand, two witnesses for the complainant (Duff and Kline) testified that they made four measurements of the embankment north and south of the place of the accident, on October 27th, just after the accident, and found the width on top to be 10 and 10½ feet, and the slope as steep as the dirt would lie. Blades testified that he worked on the embankment until the 24th or 25th of November. The testimony of Mr. Sweitzer was certainly very much to the point. Less than four hours before the accident, he rode on the work train from the steam shovel to where the earth was plowed off, the place where the accident afterwards occurred. He jumped off the train, and went into the earth up to his knees. He could not go along next to the ties, but was obliged to go down to the foot of the embankment, and go along the marsh. He climbed up the bank, which was steep, and took hold of the end of the ties to pull himself up. That the embankment did not extend beyond the ends of the ties on the east side, and in some places not as far as that. That two-thirds of the dirt was plowed off on the west side of the cars. He was corroborated by William Leverett, who worked on the grade, who said it took three men to shovel the dirt on the west side, and one on the east, and that it was usually and not exceptionally so; about every train was loaded heavier on

the west side than on the east side. George Blades, who also worked on the grade, testified that there was a slack place in the embankment, at about the place where the accident occurred, when he quit work that night. Mr. Kettel, a witness for the defendant, had his attention called to the testimony tending to show that the embankment was heavier on the west side than the east side. He said, "The banks are even on both sides. I have never had any dirt shoveled from one side of the cars to the other; consequently it must have fallen evenly." I do not think the reason conclusive or very satisfactory. Then this question was asked: "Q. There is testimony showing that the ends of the ties on the bank on the east side stuck out over the embankment. What is the fact, and what is the first part of the tie you are supposed to tamp?" His answer was: "It is the end." The question was not repeated. Defendant's counsel introduced some photographs, taken three days after the accident, but, of necessity, they cannot show the condition of the bank where the accident occurred, at the time it occurred.

In carefully weighing the evidence, it is a matter worthy of note that nearly all the witnesses for the defendant have a special interest in the case, not only by reason of their being the employés of the defendant, but also because their work is on trial. Their reputation as competent and prudent railroad workmen is at stake. It is but natural that they should wish to give their work as good a character as possible. On the other hand, no motive was apparent or suggested why the witnesses Sweitzer, Blades, and Leverett should have any wish to color or distort the facts one way or the other. If the embankment was in the condition on the 25th of October, as testified to by these witnesses, whatever may have been its width, or however much or little earth may have been put on it afterwards, it was in a dangerous and unsafe condition; and the defendant's general manager, who passed over it a few hours earlier the same day, and his master of construction, who passed over it less than two hours before the accident, should have known it. The strongest evidence that it was weak and dangerous was the accident itself. The first heavy strain that was put upon it, after the day's work was done, caused it to go down. I apprehend the presumption of negligence must remain until the accident is reasonably accounted for in some other way. The giving way of the embankment was certainly strong evidence that the defendant's witnesses must have been mistaken as to its construction and proportions. If not, why did it go down?

There was another point on which negligence was claimed. I believe all the experts who testified on the subject said that reasonable and ordinary care in such a case required that a watchman should be kept on such an embankment until the earth had become settled,—say from four to six weeks,—whose duty should be to patrol the embankment, and note the effect on it of the passage of trains, so as to give timely warning in case of danger. No such watchman was provided. It is no sufficient answer to say that, had there been a watchman, he could not have seen any defect in the embankment. How is any one to know that? How can any one say that there may not have been such signs of weakness or loosening in the sides of the embankment as to be clearly apparent to a watchman charged with the duty of examination? I find, therefore, as a fact, that the accident was caused by the giving way of the embankment. Whether that was due to quicksand, or too much wetness, or inadequate bolting of the angle bars, or the manner in which the earth was tamped under the ties or shoveled down the bank, or to a combination of all these, I do not think it important to determine. I think the defendant did not exercise the care which reasonable and ordinary prudence in such cases requires.

### As to the Question of Damages.

To show the expectancy of life on the part of the decedents, complainants offered in evidence section 4245 of Howell's Annotated Statutes, being a "Table of Mortality Based on American Experience." According to that table, George Alberts, the decedent, who was 30 years of age, immediately prior to his death had an expectancy of life of 35⅓ years, and Silvio H. Beaulieu, who was 34 years old, had an expectancy of life of 32½ years. It

was urged by counsel for the defendant that that table ought not to be made the basis of the calculation of the expectancy of life, because that table is based upon general mortality, while the decedents were engaged in an extrahazardous occupation. No case has been cited in which such a distinction has been made. Mortality tables have been used in evidence in a great number of cases, and in the following cases, where the decedents were employés of the defendants, but no such distinction was made: Haden v. Railroad Co. (Iowa) 48 N. W. 733; Gorman v. Railway Co. (Iowa) 43 N. W. 303; Hunn v. Railroad Co. 78 Mich. 513, 44 N. W. 502. It is true there is no law compelling the decedents, had they lived, to remain in the hazardous employment of a locomotive engineer; yet their earning capacity was based on their employment in that occupation. Whether they could earn as much in some less hazardous employment is a matter of opinion, as there was no evidence on the subject. There was no evidence as to the extent or degree to which the extrahazardous employment would affect the expectancy of life. Making allowance for that, and considering the increased earning capacity that would come with additional experience, and the further sum that might be reasonably added for the care, assistance, and instruction of the children during the remaining years of minority, I assess the damages of complainant Cassie Alberts at the sum of $9,935, and of complainant Ida B. Beaulieu at the sum of $11,606.

Charles H. Kline, for Cassie Alberts.

Justice & Lairy and W. S. Thurstin, for Ida Beaulieu.

Alex. L. Smith, for receiver.

RICKS, District Judge. This case is now before the court upon the exceptions to the report of the special master, Gen. L. S. Trowbridge, filed upon the intervening petitions of Cassie Alberts and Ida Beaulieu. The claims set forth in the intervening petitions grow out of one accident, and the facts to be considered apply equally to both cases. The master has filed with his report a stenographic report of all the testimony taken in the case, which I have read with great care. I have likewise given full consideration to the questions of law involved, and am of the opinion that the report of the master in both these cases, so far as it finds negligence on the part of the receiver as the cause of the accident, should be confirmed. The fact that the accident occurred by derailment of the train, or, what is perhaps equivalent to a derailment, a sliding and giving way of the entire roadbed, makes a prima facie case of negligence, which it is the duty of the receiver to overcome by testimony. I have considered very carefully the evidence showing the precautions which the subordinates of the receiver took before deciding to raise the grade through that part of the swamp or marsh where the accident occurred. There is a good deal of conflict as to the nature and extent of the soundings made preliminary to the work, and I think the master found correctly, as a matter of fact, that these soundings were not of a character to relieve the receiver from the charge of negligence as to putting upon that roadbed the large additional weight made necessary by the elevation of the track for the distance stated. It is very evident from the way the accident happened that the freight train which the engine was drawing, upon which these unfortunate men were working, was too heavy for that track in the condition in which it was then left by the construction trains. More time for the proper ballasting of the

roadbed should have been given. But it is not necessary to go into a detailed statement of the facts. As stated before, I am satisfied that the master has reached a correct conclusion, and that there was negligence on the part of the receiver and his subordinates in undertaking to move that train over that track in its condition at that time.

The question, however, about which I have been more perplexed, is the amount of damages awarded by the master. He has given the basis upon which that award was made. The earning capacity of these two men was shown. Their probable future life was established by the annuity tables, and the master, giving due allowance for the extra hazard to life because of the nature of the employments of the deceased, made his calculation, and allowed to Cassie Alberts the sum of $9,935, and to Ida Beaulieu the sum of $11,606. It is evident in this estimate that the master has given to these petitioners the full benefit of all the probable years of life before them, and the full benefit of their present maximum earning capacity. One of the most difficult questions for a court to determine is a correct and just measure of damages in a case of this kind. It is hard to say that a human life is not worth such a sum as the master has given in this case, because the record shows these men were men of excellent habits, fond and affectionate husbands, and in every way a help and comfort to their families and useful to the public, and it is with great reluctance that I interfere in any way with this award. But in a large number of states where the limit for the loss of life has been fixed by legislation the sum of $10,000 has been fixed as the maximum allowance to be made. This is a legislative construction of a fair maximum sum to be awarded in such cases. I think the court may properly, therefore, accept this concurrent judgment of so many different state legislatures as justifying it in saying that the maximum ought not in any one of these cases to exceed that sum. So that, if the petitioner Ida Beaulieu will remit sufficient of the award made to her to reduce it to the sum of $10,000, and if the petitioner Cassie Alberts will remit sufficient of the award made to her to reduce it to $8,500, the court will then approve an award to that amount, and order the receiver to pay the same.